**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **BRENDA J. HARRIS,** | ) | **Case No. 10 C 50229** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Hon. P. Michael Mahoney** |
| **v.** | ) | **U.S. Magistrate Judge** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.      Introduction**

Brenda J. Harris seeks judicial review of the Social Security Administration

Commissioner's decision to deny her application for Disability Insurance Benefits ("DIB")

pursuant to Title II of the Social Security Act, 42 U.S.C. § 416, 423; and Supplemental Security

Income ("SSI") under Title XVI of the Social Security Act, *See* 42 U.S.C. § 405(g). This matter

is before the Magistrate Judge pursuant to the consent of both parties, filed on January 18, 2011.

*See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

**II.     Administrative Proceedings**

Claimant first filed for DIB on April 23, 2008; and SSI on March 24, 2008 (Tr. 17.) She

alleges a disability onset date of October 22, 2007 (*Id*.) Her claims were denied initially and on

reconsideration (Tr. 1, 14.) The Administrative Law Judge ("ALJ") conducted a hearing into

Claimant's application for benefits on August 10, 2009. (Tr. 17.) At the hearing, Claimant was

represented by counsel and testified. (*Id*.) Mr. Dunleavy, a Vocational Expert (hereinafter

referred to as "VE") was also present and testified (*Id*.) The ALJ issued a written decision

denying Claimant's application on September 15, 2009, finding that Claimant was able to perform past relevant work as a general clerk. (Tr. 14, 23.) Because the Appeals Council denied Claimant's Request for Review regarding the ALJ's decision, that decision constitutes the final decision of the Commissioner. (Tr. 1.)

### III.   Background

Claimant testified to the following:

She was 50 years old and married (separated). (Tr. 34.) She lived in a house with a family friend, and paid rent until she lost her job in October of 2007. (Tr. 34-35.) She was five feet and seven inches tall, weighed 165 pounds, and graduated from high school (Tr. 34, 168.)

Claimant had no income, received no worker's compensation benefits or long term disability, nor unemployment benefits or government benefits, including food stamps. (Tr. 34-35.) The Claimant did receive short-term disability benefits from October of 2007 until the end of 2007 from her last employer, Filtration Group Inc. (Tr. 35-36, 158.)

Claimant worked at Filtration Group as a hand packager from April 2007 until her release in October 2007. (Tr. 42, 170.) At Filtration Group, Claimant did light assembly work that required her to lift big rolls of material weighing up to fifty pounds, and then proceed to re-roll it on a machine. (Tr. 38.) Claimant's disability report indicates that prior to Filtration Group, Claimant worked for Clean-Tech of Illinois from 2006 to 2007. (Tr. 158, 170.) At Clean Tech Claimant served as a housekeeper, which required her to vacuum, sweep, dust, move furniture, clean windows, and lift up to twenty pounds at a time. (Tr. 38-39.)

Claimant also worked for Expert Optics as a general clerk during 2005. (Tr. 41, 170.) At Expert Optics, Claimant was required to read paperwork on a tray containing lenses, decide its

appropriate place, then either slide or carry the tray of less than ten pounds from one countertop to another roughly five feet away, and do so while standing the entire time. (Tr. 40-41, 60.)

Before working at Expert Optics, Claimant was a machine operator for Dow Chemical Company and Insta-Foam Products. (Tr. 40, 160.) Claimant's disability report indicates that she worked at Dow from 2000 to 2004, and was required to lift and fill cylinders with chemicals, then to bring them to a conveyor belt up to 100 to 200 times a day. (Tr. 160, 180.) Her disability report also indicates that she worked at Insta-Foam from 1989 to 2002. (Tr. 160, 170.) At Insta-Foam, Claimant used machines to fill chemicals into 55 gallon drums, and kept records of those drums filled. (Tr. 181.) Claimant's work at both Dow and Insta-Foam consisted of routine lifting up to twenty pounds. (Tr. 41.)

Since her dismissal from Filtration Group in October 2007, Claimant's daily activities consist of making herself breakfast, washing the dishes, and then going back to bed for a couple of hours. (Tr. 45.) Claimant can do small things around the house like light dusting and the laundry, but she cannot carry the laundry basket. (Tr. 45-46.) Claimant does not sweep or vacuum her home, leaving this to either her roommate or her daughter when she comes over to visit. (Tr. 46.) Claimant eats three times a day, making herself mainly sandwiches and not cooking big meals. (Tr. 45.) Claimant does not do major grocery shopping for herself, but will drive to the store to buy small things like a loaf of bread. (Tr. 47.) Claimant reads and watches television for recreation, and can follow the information therein. (Tr. 46.)

Claimant stated that she could lift small piles of clothes, but no more than a couple of pounds. (Tr. 47-48.) She could sit no longer than a half hour before feeling pain in her back, and stand only ten to fifteen minutes, enough to allow her to wash the dishes. (Tr. 48.) Claimant said she could not bend down to pick things off the floor, but could lean over a table. (*Id*.)

Additionally, Claimant testified that she could only walk up to a half a block before feeling discomfort in her back and down her leg. (Tr. 63.) Claimant does all her own personal care and hygiene. (Tr. 48.)

Claimant testified about her numerous medical issues, including a collapsed lung, lumbago, and an injured wrist. (Tr. 52, 54.) Claimant stated that she collapsed her lungs, "spontaneous neumothorax," both in July and November of 2008. (Tr. 53.) Claimant noted that her lung was no longer collapsed, no doctor was currently treating her for it, and that her breathing was good. (Tr. 53-54.) She was instructed that if another collapse occurred, to return to the emergency room and have it re-inflated by a chest tube. (Tr. 53.) Additionally, the Claimant testified she had a wrist fusion surgery in 2003, and then re-injured the wrist in 2006. (Tr. 54-55.) The Claimant's wrist was affecting her at the time of the hearing, giving her cramps while performing repetitive motions like typing or squeezing things. (Tr. 55.)

In May 2006, Claimant injured herself at her home by lifting her ninety pound dog onto a couch, causing her to feel an immediate pop in her back. (Tr. 42, 169.) Following this injury to her back, the Claimant began taking prescription pain medication. (Tr. 42-43.) The prescribed medications were not controlling her pain, so she then obtained a series of three epidural steroid injections in her back. (Tr. 44.) Following the injections, the Claimant began taking Vicodin for the pain. (*Id*.)

Claimant stated that she was recommended for surgery on her back, but claims she had no means to pay for it. (Tr. 44.) Moreover, Claimant mentioned that she was worried about the potential back surgery because the doctor told her it did not work for everyone. (*Id*.) She continued to take Vicodin for quite a while, but at the time of the hearing she had been off Vicodin and was taking the generic form of Altram. (Tr. 45.)

4

Vocational Expert ("VE"), Thomas Dunleavy, was present at Claimant's hearing for questioning. (Tr. 56.) The VE described Claimant's past work as a housekeeper as light, and unskilled. (Tr. 58.) Additionally, the VE described Claimant's past work as a machine operator as heavy, and semi-skilled. (Tr. 58, 164.) Claimant's job as a general clerk was described by the VE as light, unskilled work. (Tr. 46.) Lastly, the VE described in his written records that Claimant's job as a hand packager was medium, and unskilled. (Tr. 58.)

The ALJ asked the VE if Claimant would be able to do work she's performed in the past, and to apply the following hypothetical fact pattern to the Claimant's previous jobs:

> [L]ift and carry no more than twenty pounds occasionally and ten pounds frequently and can only occasionally bend, stoop, squat, crouch or kneel … not be exposed to working at heights or climbing ladders … able to negotiate stairs only occasionally and has a mild inability to maintain attention and concentration due to pain … a level of three on a scale of one to ten … [a]nd ten is the greatest degree of severity.

(Tr. 62.) The VE stated that Claimant would be able to perform her past work as a general clerk based on the abovementioned hypothetical. (Tr. 62.) Then the ALJ asked the VE to consider a different scenario, and the following hypothetical was presented to him:

> [A]ssuming that the claimant were unable to lift no more than – let's say, less than ten pounds occasionally … sit no more than thirty minutes at a time … stand no more than ten to fifteen minutes at a time. She could do no bending.

(Tr. 63.) The VE stated that based on this hypothetical the Claimant would be precluded from performing the jobs she had done in the past. (*Id*.) Additionally, the VE opined that based on the Claimant's inability to bend at all, no type of work would be feasible for her. (Tr. 64.)

**IV.    Medical Evidence**

Claimant's medical records relating to her alleged impairments begin on May 24, 2006 with a patient progress note from her primary care physician, Dr. Sumin Shah, D.O. (Tr. 344.) Dr. Shah's note indicated that Claimant had a low back strain. (*Id*.) Claimant returned to Dr. Shah on May 30, 2006 and June 12, 2006. (Tr. 341, 343.) On both dates Dr. Shah noted that Claimant's back continued to bother her, and on June 12 Dr. Shah ordered an MRI of Claimant's back. (*Id*.) On July 9, 2006, Dr. Robert A. Breit, M.D. of Joliet Open MRI administered the MRI of Claimant's back ordered by Dr. Shah. (Tr. 325, 341.) Dr. Breit found desiccation and minor disc bulging at L4-5, but no focal disc herniation. (Tr. 325.) On July 12, 2006, Dr. Shah reviewed Claimant's MRI, and found pain due to sciatica, small L4-5 disc bulge, and prescribed Vicodin. (Tr. 349.) Additionally, Dr. Shah issued Claimant a note indicating that she could not lift, push, or pull anything greater than fifteen pounds at work, could not work at heights, and should not operate heavy machinery. (Tr. 337.)

On June 7, 2006, Claimant began seeing Michael J. Condon, D.C. (Tr. 244.) Claimant saw Condon again on nine occasions between June 9, 2006 and June 22, 2006. (*Id*.) On June 12, 2006 Dr. Condon indicated that Claimant had a maximum cervical flexion angle of 54°, maximum cervical extension angle of 55°, cervical flexion impairment of 0%, cervical extension impairment of 2%, and a total cervical range of motion and ankylosis impairment of 2%. (Tr. 245.) Additionally, Dr. Condon's records show that Claimant had a maximum lumbar flexion angle of 59°, maximum lumbar extension angle of 17°, lumbar flexion impairment of 5%, lumbar extension impairment of 3%, and a total lumbar range of motion and ankylosis impairment of 8%. (Tr. 246.)

On July 1, 2006, Claimant had an EMG done by a neurologist, Dr. Bakul K. Pandya, M.D. (Tr. 323.) Dr. Pandya found that the EMG was "abnormal," and showed a mild to moderate L3-4 radiculopathy. (*Id.*)

On August 4, 2006 and August 10, 2006, Claimant saw nurse practitioner Lucinda Dewaele-Guzmnan. (Tr. 353.) Dewaele-Guzman diagnosed Claimant with essential hypertension, and generalized anxiety disorder. (*Id.*) On November 21, 2006 and complaining of right wrist pain, Claimant returned to Dewaele-Guzman. (Tr. 351.) Dewaele-Guzman told Claimant to take ibuprofen, wear a wrist support, and ordered an x-ray of her wrist. (*Id.*)

Claimant returned to Dr. Shah on August 11, 2006, and was diagnosed with lumbar radiculopathy. (Tr. 336.) On November 6, 2006, Claimant again saw Dr. Shah and he diagnosed her with lumbago. (Tr. 355.)

In a June 7, 2007 letter written by Dr. George DePhillips, M.D., S.C., a neurologist whom Dr. Shah referred Claimant to, Dr. DePhillips noted that Claimant had received lumbar epidural steroid injections, and that the physical therapy she had undergone for two months had aggravated her symptoms. (Tr. 384.) Additionally, Dr. DePhillips stated that Claimant's MRI revealed disc degeneration with desiccation at the L4-L5 level with disc protrusion, and that she failed to improve with conservative treatment. (*Id.*) Dr. DePhillips concluded that Claimant was suffering from mechanical low back pain and instability due to discogenic pain, and that Claimant was interested in surgery, her options being IntraDiscal Electrothermal Treatment or a spinal fusion. (*Id.*) Dr. DePhillips recommended Claimant undergo a lumbar discography at L4-L5 and L5-S1. (*Id.*)

On July 30, 2007 and upon referral by Dr. DePhillips, Claimant saw Dr. Mauricio Orbegozo, M.D. of the Pain Centers of Chicago. (Tr. 277.) Dr. Orbegozo diagnosed Claimant

with lumbar discogenic back pain, and advised her to proceed with the lumbar discogenic provocative discogram. (Tr. 278.) On August 17, 2007, Dr. Orbegozo performed Claimant's provocative lumbar discogram at three levels of her back: L3-L4, L4-L5, and L5-S1. (Tr. 288.) Dr. Orbegozo found that Claimant had discogenic back pain with positive reproduction at L4-L5, and lumbar degenerative disc disease. (Tr. 288.) Additionally, and as reviewed by Dr. Brian M. Fagan, M.D., the discogram revealed disc bulges at L3-4, L4-5, L5-S1, and that there were small focal tears at L3-4 and L5-S1. (Tr. 295.) Dr. Fagan also noted that there was no greater than mild stenosis within the limits of the discogram at any level. (*Id.*)

On August 28, 2007, Claimant returned to the Pain Centers of Chicago to see Dr. Morales, M.D. (Tr. 285.) Dr. Morales opined that Claimant had a L4-L5 disc bulge and lumbar radiculopathy. (*Id.*) Additionally, Dr. Morales noted that Claimant's pain had increased for two days after her discogram before returning its previous level, and that the Vicodin was providing good pain control for her. (*Id.*)

On September 19, 2007 Dr. DePhillips recommended Claimant get a second opinion from Dr. Michel Malek, M.D. (Tr. 383.) On October 22, 2007, Dr. Malek opined that the Claimant suffered from lumbar radiculopathy, and specifically from the Claimant's MRI on July 9, 2006, desiccation at L4-L5. (Tr. 362.) Dr. Malek's review of Claimant's lumbar discogram done August 17, 2007, revealed to him that Claimant had positive concordant pain at the L4-L5 level; and that the post discogram CT done the same day showed a small left posterolateral annular tear at L5-S1, small focal left posterolateral tear at L3-L4, and no annular tear at L4-L5. (Tr. 362-633.) Additionally, Dr. Malek opined that the Claimant's MRI from September 21, 2007 showed desiccation at the L4-L5 level, and some bulging on the left side of the L3-L4, but no disc herniation. (Tr. 362.)

On September 21, 2007, Claimant had another MRI done of her lumbar spine, and it was read by Dr. Richard A. Hammer, M.D. of Provena St. Joseph. (Tr. 365.) Dr. Hammer found the Claimant had degeneration of the disc with diminished signal at L3-4. (Tr. 365.) Additionally, Dr. Hammer found small focal protrusions of disc material that possibly represented a herniation on the left side of L3-4, minimal contact between the L3 nerve root that is within the neural foramen, degenerative changes at L4-5 with diminished signal, the L5-S1 and L2-3 are within normal limits, no bone lesions, and that the conus is within normal limits. (*Id*.)

On return to Dr. DePhillips on October 22, 2007, the Claimant continued to complain of lower back pain. (Tr. 383.) Dr. DePhillips noted that Dr. Malek agreed with his diagnoses that patient has discogenic pain at the L4-L5 level. (Tr. 383.) Dr. DePhillips further opined that there was a small tear in the annulus on the left side at the L3-L4 level with a protrusion that was not painful on discography. (*Id*.) Dr. DePhillips concluded that Claimant was no longer able to continue doing her current job where she stands for prolonged periods of time, ten hours, and that she undergo an "aggressive conservative treatment" that included physical therapy to strengthen her lower back. (*Id*.)

On November 20, 2007, Claimant saw Physical Therapist Ryan Schaul of Neuro-Spine Physical Therapy. (Tr. 391.) Schaul indicated that Claimant showed small improvement in her increased abdominal strength, some improvement in her mobility, but that she continued to have pain and low back soreness at the end of the day. (Tr. 391.) Additionally, Schaul noted that the Claimant had missed four physical therapy sessions, and that she babysits her grandchildren during the day which involves her doing some lifting. (*Id*.) Schaul recommended that Claimant continue doing physical therapy three times per week for the next four weeks. (*Id*.)

On November 21, 2007, Claimant returned to Dr. DePhillips. (Tr. 382.) Claimant continued to complain to Dr. DePhillips of lower back pain, and pain shooting into her left leg from her back. (Tr. 382.) Dr. DePhillips found that Claimant's MRI, although he does not indicate which one he is referring to, did not reveal any significant nerve root impingement. (*Id.*) Additionally, Dr. DePhillips reaffirmed that Claimant suffered from discogenic pain, with her only surgical option being a spinal fusion. (*Id.*)

On December 10, 2007, Claimant returned to Dr. Malek for a review of one of her MRI's, however it is not indicated which one he is referencing. (Tr. 359.) Upon review, Dr. Malek found that there was pathology at the L4-L5 level with desiccation, but did not see any definite pathology at the L2-L3 and L3-L4 level, though there was evidence of a narrowing of the foramen and a possible tear. (*Id.*) Additionally, Dr. Malek found that Claimant's EMG done on July 1, 2007 by Dr. Pandya, was abnormal and showed a mild to moderate L3-L4 radiculopathy. (*Id.*) Dr. Malek recommended that if the pathology were to be addressed, it should be the L3-L4 and L4-L5. (*Id.*)

The Claimant returned to Dr. DePhillips on December 10, 2007, where she indicated that she continued to have lower back pain that radiated into her left leg, and that she was still undecided about proceeding with a spinal fusion on L4-L5 and possibly L3-L4. (Tr. 382.) Dr. DePhillips noted that Claimant was going to remain off work until her follow up evaluation in one month. (*Id.*)

On December 28, 2007, Claimant failed to attend her physical therapy appointment at Neuro-Spine Physical Therapy. (Tr. 390.) The treating physical therapist, Ryan Schaul, indicated in a discharge summary that Claimant had attended seven sessions of physical therapy, but had missed six sessions. (*Id.*) Additionally, Schaul noted that the Claimant had made little progress

due to her lack of consistent attendance, and poor consistency with HEP (home exercise

program). (*Id*.) The discharge summary stated that Claimant had contacted the office and that she

would be ending her therapy due to unrelated health issues. (*Id*.) The discharge summary also

documented Claimant's evaluations from her initial appointment on October 25, 2007 and her

last one on November 20, 2007. (*Id*.) The summary indicated that Claimant could sit for twenty

minutes, walk for twenty minutes, had pain when using stairs and ramps, and had a twenty pound

weight restriction. (*Id*.)

On January 10, 2008, Claimant returned to Dr. DePhillips complaining of severe lower

back pain radiating to her left leg, and that her back pain was worse than her leg pain. (Tr. 381.)

Dr. DePhillips also noted that Claimant was going to try and live with her pain rather than

undergo a spinal fusion. (*Id*.) Dr. DePhillips concluded that Claimant "remains permanently and

totally disabled and is unemployable." (*Id*.) Additionally, Dr. DePhillips refilled Claimant's

prescription for analgesic medication, and indicated that he planned on seeing her again in three

to four months. (*Id*.)

 The Social Security Administration arranged for Dr. Sarat Yalamanchili, M.D., S.C.

("State Agency Consultant") of Immediate Care Center, to examine the Claimant on June 19,

2007. (Tr. 435.) Dr. Yalamanchili found no evidence of localized bony deformity, point

tenderness, or muscle spasms in Claimant's back. (Tr. 437.) Dr. Yalamanchili noted that all of

the Claimant's extremities were within normal limits, specifically the flexion and extension of

her lumbar spine, and that a straight leg test performed on Claimant had normal results. (Tr. 437-

38.) Dr. Yalamanchili opined that Claimant's gait was steady, and that during the testing of her

gait she did not need a cane. (Tr. 438.) Dr. Yalamanchili concluded that Claimant had lower back

pain possibly from her history of lumbar radiculopathy, had hypertension, and suffered from anxiety attacks. (*Id.*)

On July 14, 2008, a State Agency reviewing physician, Dr. Francis Vincent, M.D., completed Claimant's Residual Functional Capacity Assessment ("RFC"). (Tr. 440-47.) Dr. Vincent reported that the Claimant could occasionally lift/carry/upward pull twenty pounds, frequently lift/carry/upward pull ten pounds, and stand/walk/sit about six hours each in an eight hour workday with normal breaks. (Tr. 441.) Additionally, that Claimant's ability to push or pull with her lower extremities was limited. (*Id.*) Dr. Vincent noted that his conclusions were based on Claimant's back condition. (*Id.*) Dr. Vincent concluded that Claimant could occasionally climb ramp/stairs/ladder/rope/scaffolds, stoop, kneel, crouch, and crawl due to low back pain; that she had no other postural limitations; and that Claimant had not established any manipulative, visual, communicative, or environmental limitations. (Tr. 442-44.) Additionally, Dr. Vincent opined that based on the evidence given to him, Claimant's statements were found to be partially credible. (Tr. 447.)

On September 22, 2008, Dr. Vincent's RFC determination and Claimant's file were provided by the Social Security Administration to Dr. Richard Bilinsky, M.D. for review. (Tr. 449.) After review, Dr. Bilinsky agreed with Dr. Vincent's RFC conclusions. (*Id.*) However, Dr. Bilinsky did note that Claimant's condition had changed since June 2008, specifically the pain in her lower and middle back. (Tr. 450.) Dr. Bilinsky found Claimant partially credible. (*Id.*)

On August 27, 2008, Claimant sought medical treatment at the Will County Community Health Center. (Tr. 461.) Claimant's chief complaint was continued neck and back pain, as well as arm and foot pain, culminating in a level of pain at six on a scale of one to ten. (*Id.*) Claimant's diagnosis was listed as back and arm pain. (Tr. 462.)

12

On December 8, 2008, Claimant returned to the Will County Community Health Center, where she complained of pain in her neck/back/arm, and that she had a collapsed lung. (Tr. 460.) The diagnosis states only that Claimant had back/neck/arm pain. (*Id*.) Claimant returned to the Will County Community Health Center on April 21, 2009, and again complained of neck/back/leg pain, as well as a lump on the back of her neck. (Tr. 458.) The attending physician diagnosed Claimant with cervical pain, and back pain. (*Id.*)

On May 22, 2009, Dr. Clarence Abella, M.D. ordered an MRI done on Claimant's cervical spine, and a comparison of that with an x-ray of Claimant's cervical spine from November 21, 2008. (Tr. 466.) The reviewing physician, Dr. Gregory Price, D.O., found that there was a mild "reversal of the normal cervical lordotic curvature that is combining with posterior disc osteophyte complexes at C4-5 and C5-6 to cause effacement of the ventral subarachnoid space but significant cord deformity." (*Id*.) Dr. Price found Claimant's C2-3 and C3-4 unremarkable, mild curvature of her spine, loss of signal within the her disc with disc space narrowing at CF-6, but that her remaining disc levels were within normal limits. (*Id*.) Further, Dr. Price opined that that the visualized portions of Claimant's spinal cord were normal size and signal, and her corticomedullary junction appeared preserved. (*Id*.)

Claimant returned to the Will County Community Health Center on May 19, 2009. (Tr. 457.) Claimant complained again of continuing neck and back pain, and the attending physician diagnosed the Claimant with cervical back pain, as well as having an enlarged thyroid. (*Id*.)

## V.      Standard of Review

The court may affirm, modify or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). The ALJ's legal conclusions are reviewed *de novo*. *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 1997). However,

the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Id.* Additionally, the "ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." *Clifford v.* Apfel, 227 F.3d 863, 870 (7th Cir.2000). However, the duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case are entrusted to the Commissioner. *Schoenfeld v. Apfel,* 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner.")

If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C § 405(g); *see also Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion,* 108 F.3d at 782. If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). If the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Clifford* 227 F.3d at 874; *Rohan v. Charter*, 98 F.3d 966, 971 (7th Cir. 1996).

## VI.    Framework for Decision

"Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C § 423(d)(3).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity, (2) whether the claimant suffers from a severe impairment, (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments, (4) whether the claimant is capable of performing work which the claimant performed in the past, and (5) whether any other work exists in significant numbers in the national economy which accommodates the claimant's residual functional capacity ("RFC") and vocational factors. *See* 20 C.F.R. § 404.1520.

VII.    **Analysis**

    1.      **Step One: Is the Claimant Currently Engaged in Substantive Gainful Activity?**

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. *See* 20 C.F.R. § 404.1520(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties and is done, or intended to be done, for pay or profit. *See* 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found "not disabled" regardless of medical condition, age, education,

or work experience, and the inquiry ends. If the claimant is not engaged in substantial gainful activity, the inquiry proceeds to Step Two.

Here, the ALJ determined that Claimant had not engaged in substantial gainful activity at any time relevant to his decision, specifically since the departure from her last job on October 22, 2007. (Tr. 19.) The ALJ does note that the Claimant's records indicate that she earned $581.02 in 2008, however, he concluded that this work must be considered an unsuccessful attempt at work rather than a substantial gainful activity. (*Id.*) Neither party disputes these findings. As such, this Court affirms the ALJ's Step One determination.

### 2.    Step Two: Does the Claimant Suffer From a Severe Impairment?

Step Two requires a determination whether the claimant is suffering from a severe impairment. A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. *See* 20 C.F.R. § 404.1520(c). If the claimant suffers a severe impairment, then the inquiry moves on to Step Three. If the Claimant does not suffer a severe impairment, then the claimant is found "not disabled," and the inquiry ends.

In the present case, the ALJ found that Claimant had the following severe impairments: "discogenic degenerative disease and essential hypertension." (Tr. 19.) Neither party disputes this finding. As such, this Court affirms the ALJ's Step Two determination.

### 3.    Step Three: Does Claimant's Impairment Meet or Medically Equal an Impairment in the Commissioner's Listing of Impairments?

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "Listings"). The Listings describe, for each of the body's major systems, impairments which are considered severe enough *per se* to prevent a person from adequately

performing any significant gainful activity. *See* 20 C.F.R. §§ 404.1525(a); 416.925(a). The

Listings streamline the decision process by identifying certain disabled claimants without need to

continue the inquiry. *See Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the

claimant's impairment meets or is medically equivalent to a listed impairment, then the claimant

is found to be disabled, and the inquiry ends. If not, the inquiry moves on to Step Four.

In performing the Step Three analysis in this case, the ALJ determined that Claimant did

not have an impairment or combination of impairments that meets or medically equals one of the

listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 20-21.) The ALJ found that

Claimant was neither extremely limited in ambulation nor totally inhibited from performing

manipulative activities. (Tr. 20.) Furthermore, the ALJ concluded that the Claimant had

hypertension, but its lack of diagnoses placing it in connection with any cardiac diseases,

precludes any cardiovascular listing severity for the Claimant. (Tr. 21.) Neither party challenged

the ALJ's findings at Step 3, so the Court will affirm the ALJ's determination.

### 4. Step Four: Is the Claimant Capable of Performing Work Which the Claimant Performed in the Past?

At Step Four, the Commissioner determines whether the claimant's RFC allows the

claimant to return to past relevant work. RFC is a measure of the abilities which the claimant

retains despite his or her impairment. *See* 20 C.F.R. § 404.1545(a), 416.945(a). The RFC

assessment is based upon all of the relevant evidence, including: objective medical evidence;

treatment; physicians' opinions and observations; and the claimant's own statements about his or

her limitations. *See Id*. Although medical opinions bear strongly upon the determination of the

RFC, they are not conclusive. The determination is left to the Commissioner, who must resolve

any discrepancies in the evidence and base a decision upon the record as a whole. *See* 20 C.F.R.

§§ 404.1527(e)(2), 416.927(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

When assessing the credibility of a claimant's statements about his or her symptoms, including pain, the ALJ should consider the following in addition to the objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. Social Security Ruling 96-7p; *see* 20 C.F.R. § 404.1529(c).

"Past relevant work" is such work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and frequency requirements. *See* 20 C.F.R. §§ 404.1565(a), 416.965(a); Social Security Ruling 82-62. If the claimant's RFC allows the claimant to return to past relevant work, the claimant will be found "not disabled" and the inquiry ends. If the claimant is unable to return to past relevant work, the inquiry proceeds to Step Five.

In performing the Step Four analysis, the ALJ determined Claimant's RFC to be the following:

> [T]he claimant has the residual functional capacity to perform lifting/carrying no more than 20 pounds occasionally and 10 pounds frequently, occasional bending, stooping, squatting, crouching, or kneeling, no exposure to work at heights or climbing ladders, occasional climbing stairs, and mildly limited ability to maintain attention and concentration due to pain.

(Tr. 21.) In making this determination, the ALJ asserts that he "considered all symptoms in accordance with the requirements of 20 CFR §§ 404.1529 and 416.929 and SSRs 96-4p and 96-7p." (Tr. 22.) He also claims to have "considered opinion evidence in accordance with the requirements of 20 CFR §§ 404.1527 and 416.927 and SSRs 96-2p, 96-5p, and 96-6p." (*Id.*) The ALJ found that Claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms. (*Id.*) The ALJ then had to consider the intensity, persistence, and limiting effects of Claimant's symptoms to determine the extent to which they limit Claimant's ability to do basic work activities. Where statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by medical evidence, a finding is made on the credibility of the statements based on a consideration of the entire record. The ALJ concluded that Claimant's statements concerning intensity, duration, and limiting effects of her symptoms were not entirely credible. (*Id.*)

The ALJ held that Dr. DePhillips' opinion that Claimant was "permanently and totally disabled and unemployable" was an issue reserved for the Commissioner. (*Id.*) The ALJ reasoned that concluding a claimant is "disabled" or "unable to work" is an administrative finding reserved for the Commissioner, and not a medical opinion. (*Id.*) Additionally, the ALJ gave "little weight" to the state agency's medical consultant because he did not benefit from medical evidence (Exhibit 10F) submitted after he made his decision. (*Id.*)

The Claimant raises a number of issues challenging the ALJ's Step Four finding. Specifically, the Claimant argues that the ALJ: (1) Improperly dismissed Claimant's treating physician's opinion, (2) Failed to create a logical bridge between the evidence and his conclusion that Claimant lacked credibility, and (3) Failed to create a logical bridge between the evidence and his RFC conclusion.

The Court begins its review of the ALJ opinion by noting that the ALJ's entire "analysis" is contained in two paragraphs. The first paragraph seems to address certain evidence in relation to Claimant's credibility. The second paragraph discredits the medical opinions of Claimant's treating and state agency physicians, and does so in four conclusory sentences. It is in this context that the Court must attempt to review the ALJ opinion.

### a. The ALJ's Rejection of The Treating Physician's Opinion.

Claimant argues that the ALJ's rejection of Claimant's treating physician's opinion was done erroneously and without explanation. The opinion of a treating physician is entitled to controlling weight if it is well supported and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Moss v. Astrue,* 555 F.3d 556, 560 (7th Cir.2009). If the treating physician gives an opinion on an issue reserved for the ALJ, that opinion is not given controlling or special significance, because doing so would be an abdication of a role reserved for the Commissioner. 20 C.F.R. § 404.1527(e); SSR 96-5p; *Dixon v. Massanari,* 270 F.3d 1171, 1177 (7th Cir.2001.) However, even if a treating physician does conclude upon an issue reserved for the commissioner, the ALJ may not ignore the entire body of evidence from a treating physician, and still must analyze it and consider the factors as would be applied to any other medical opinion. SSR 96-5p. These factors include: "(1) the length, nature, and extent of the treatment relationship, (2) the frequency of examination, (3) the physician's specialty, (4) the types of tests performed, and (5) the consistency and supportability of the physician's opinion." *Moss*, 555 F.3d at 560 (citing 20 C.F.R. 404.1527(d)(2)).

The ALJ must express the specific reasons for the weight he chose to give to the treating physician's opinion, support it by evidence from the record, and do so with enough specificity to allow for potential review of his determination. SSR 96-2p; SSR 96-5p. Additionally, if the ALJ

comes to the conclusion that the treating physician's opinion lacks consistency with other evidence in the record, he must explain what the inconsistencies are. *Clifford* 227 F.3d at 870-71.

Dr. DePhillips, whom Claimant saw between June of 2007 and January of 2008, stated that an MRI of Claimant's spine revealed disc degeneration with desiccation at L4-L5 with disc protrusion. (Tr. 384.) Dr. DePhillips also noted that Claimant suffered low back pain and instability due to discogenic pain. (*Id.*) The Claimant obtained a second opinion on her injuries from Dr. Malek, who agreed with Dr. DePhillips that Claimant had desiccation at L4-L5. (Tr. 362-63, 383.) Dr. Malek further opined that Claimant suffered from lumbar radiculopathy, had a small left posterolateral annular tear at L5-S1, a small focal left posterolateral tear at L3-L4, and some bulging on the left side of L3-L4. (Tr. 362.) In a January 10, 2008 written report, Dr. DePhillips noted that Claimant "remains permanently and totally disabled and is unemployable." (Tr. 381.)

The ALJ's opinion states the following about his decision to reject in totality Dr. DePhillips' opinion:

> As for the opinion evidence, I note that the treating physician's (Dr. DePhillips) opinion that the claimant is permanently and totally disabled and unemployable is an issue reserved for the Commissioner (Exhibit 7F). Statements that a claimant is "disabled", "unable to work" … are not medical opinions but are administrative findings dispositive of a case … [s]uch are issues reserved to the Commissioner, who cannot abdicate his statutory responsibility to determine the ultimate issue of disability ..."

The ALJ was correct that he must not give controlling weight or any special significance to the treating physician's opinion on an issue reserved for the commissioner. However, under SSR 96-5p., the ALJ still must analyze the treating physician's overall opinions and treatment records, and consider the 5 factors as would be applied to any other medical opinion. The ALJ made no effort to do this. Additionally, under SSR 96-2, 5p., the ALJ should have given specific

reasons for the lack of weight he gave to Dr. DePhillips' opinion. The ALJ failed to note any inconsistencies in the record that he used to discredit Dr. DePhillips opinion. Dr. DePhillips made the following significant findings during his treatment of the Claimant:

- Disc degeneration with desiccation at the L4-L5 level with disc protrusion. (Tr. 384.)

- Mechanical low back pain and instability due to discogenic pain, and failed to improve from conservative treatment. (*Id*.)

- A small tear in the annulus on the left side at the L3-L4 level with a protrusion that was not painful on discography. (Tr. 383.)

- Surgical recommendation of a spinal fusion on L4-L5 and possibly L3-L4. (Tr. 382.)

- Recommended to refrain from working her current job, and is unable to do anything similarly requiring prolonged standing of ten hours a day. (Tr. 383.)

The ALJ failed to discuss the above mentioned findings, and ignored all other treatment records, diagnoses, and opinions of Claimant's treating physicians without any further comment.

### b. The ALJ's Credibility Determination.

The ALJ's negative credibility determination contains numerous errors, and generally lacks supporting evidence and analysis. To determine a Claimant's credibility, the ALJ must follow Social Security Ruling 96-7p. and "justify the finding with specific reasons." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir.2009). However, the Court gives special deference to the ALJ's determination of a Claimant's credibility, and it will be upheld unless it is "patently wrong." *E.g. Prochaska v. Barnhart,* 454 F.3d 731, 738 (7th Cir.2006). The ALJ noted the following in his discussion of Claimant's credibility:

- At Claimant's consultative examination in June 2008, the Claimant was not using a cane. (Tr. 22.)

- Claimant was taking Aleve, had her anxiety attacks under control by taking medication, and that there was no report on Claimant's mental symptoms during the period in consideration. (*Id.*)

- Claimant's range of motion was within normal limits, and a May 2009 cervical spine MRI was unremarkable. (*Id.*)

- Claimant's daily living activities were inconsistent with her complaints, specifically that of babysitting her grandchildren, able to do dishes and small things around the house, laundry (but not carry the basket), cooks, dusts, shops (but no major shopping), and drives. (*Id.*)

- Claimant did not comply with prescribed medical treatment, including missing numerous physical therapy sessions. Additionally, work absences occurring during the "period prior to the claimant's alleged injury in October 2007 and she was always finding an excuse for being late or absent." (*Id.*)

The evidence the ALJ used to make his credibility determination is unsatisfying. First, the ALJ holds the fact that the Claimant was not using a cane at her consultative examination in June 2008 against her, and does so without explaining the basis for his reasoning. Nowhere in the record is it ever indicated that she has used a cane in the past, or that she should be using one to cope with her medical issues.

Second, the ALJ supports his negative credibility determination by referencing a May 2009 MRI, stating that the "[c]ervical spine MRI was unremarkable." (Tr.22.) This is a somewhat misleading statement by the ALJ, specifically because the report the ALJ takes this from, Exhibit 12F, only states that C2-3 and C3-4 are "[u]nremarkable;" not the entire report. (Tr. 452.) More confusing, however, is that this MRI is of Claimant's cervical vertebrae, when the majority of Claimant's pain and medical issues focus on her lumbar vertebrae, notably L3-L4, L4-L5, L5-S1. (Tr. 288, 295, 362-63, 365.)

Third, the ALJ diminished the Claimant's credibility by incorrectly stating the Claimant's alleged injury occurred in October 2007, rather than properly that of May 2006. (Tr. 22, 146.)

This confusion by the ALJ led him to wrongly conclude that the Claimant's work absences had occurred prior to the injury rather than after, and therefore that the Claimant was "always finding an excuse for being late or absent." (Tr. 22.) Placing Claimant's absences in the proper context and timeline, the absences may be consistent with her testimony and medical records indicating that Claimant continued to attempt to work for some period of time after her injury, but was ultimately unable to maintain unemployment. It is clear that the ALJ's error in recognizing the injury date contributed to his decision to weigh Claimant's absences from work and her offerings of excuses against her credibility.

Lastly, the ALJ failed to analyze and adequately explain why Claimant's daily activities are inconsistent with her medical complaints. The ALJ simply states that Claimant's "daily living [] [is] inconsistent with [her] complaints," then just lists what her daily living activities are. (Tr. 22.) The ALJ then proceeds without taking into consideration the specifics of Claimant's claimed daily living activities, including statements made by her at the hearing, notably that she:

- Does laundry, but can only lift small piles of clothes no more than a few pounds, and cannot carry the laundry basket. (Tr. 45, 47-48.)

- Can only do light dusting, and does not sweep or vacuum her home. (Tr. 45-46.)

- Makes mainly small sandwiches, and does not cook big meals. (Tr. 45.)

- Can stand to wash dishes, but only long enough to do a couple at a time. (Tr. 48.)

- Cannot bend down to pick things off the floor, but can lean over a table. (*Id.*)

The ALJ never justified his findings of inconsistency with specific reasons as to why what he listed undermines the medical evidence in the record, and thus, failed to link the evidence to his conclusions. For the aforementioned reasons, the Court finds that the ALJ's credibility determination was premised upon too many errors and too little analysis. The ALJ

cherry-picked partial information from the record, and simply listed it in a manner that prevents a meaningful review.

### c.     The ALJ's Conclusion Based On Claimant's RFC.

As a result of the ALJ's decision to dismiss Claimant's treating physician's opinion and to give little weight to the state agency consultant's opinion, as well as having found Claimant not entirely credible, the ALJ lacked the necessary supportive evidence and analysis that could create a logical bridge between the evidence in the record and his RFC.

In the hearing decision, the ALJ did list some medical evidence from the record in his description of Claimant's medical history, including, but not limited to, the following:

- Minor disc bulging at L4-5, L3-4, L4-5, and L5-S1; annular tears at L3-4 and L5-S1; lumbar discectomy at L3-S1; disc protrusion at L3-4; lumbar degenerative disc disease, and lumbago. (Tr. 20.)

- Back pain radiating to left lower extremity, including her foot, making it difficult to sit, stand, and lift objects. (*Id.*)

- Temporary relief from both an epidural injection, and physical therapy. (*Id.*)

- Physical Examination was normal. (*Id.*)

- An April 22, 2009 MRI showed a reversal of cervical lordotic curvature, and post disc osteophytes at C4-5, and C5-8 with effacement of ventral subarachnoid space.

However, the ALJ listed this evidence in such a purely cursory manner that there is no indication as to whether or not it supports or detracts from his ultimate RFC determination. It is listed in the section describing Claimant's severe impairments at Step Two. The ALJ did not analyze or draw conclusions based on the evidence listed, and there is no indication as to what evidence actually contradicts the findings of Dr. DePhillips. There is no discernable weight assigned to any of the medical evidence listed, and the ALJ did not explain what evidence does support his RFC.

Equally unclear is the ALJ's statement that he gives little weight to the State Agency Consultant's opinion because "they did not have the benefit of medical evidence submitted subsequent to that decision (Exhibit 10F)." (Tr. 22.) The citation to exhibit 10F simply refers to the State Agency RFC form. Moreover, this mere listing of exhibit 10F, without any accompanying analyses, does not in itself discredit the State Agency Consultant's opinion. There is therefore no guidance as to what evidence does undermine the State Agency Consultant's opinion, nor is there any indication as to what supports the ALJ's RFC. Nevertheless, the ALJ's ultimate RFC determination is substantially similar to the State Agency findings listed in their RFC form. Regardless, the ALJ opinion offers virtually no guidance as to what was relied upon in reaching a determination as to Claimant's RFC.

After having dismissed the opinions of both Claimant's treating physician and the state agency consultant, as well as Claimant's own testimony for lack of credibility, it can only be assumed that the ALJ relied upon his own judgment to determine the RFC. As the Seventh Circuit has stated on many occasions, the ALJ may not substitute his own judgment in place of substantial evidence in the medical record. *See Clifford* 227 F.3d at 870.

Because the ALJ failed to render a decision supported by substantial evidence in the record, and because it is so poorly articulated as to prevent this Court from being able to trace the path of his reasoning, the Court finds that the ALJ failed to create a logical bridge between the evidence in the record and his conclusion that Claimant could perform her past work. The ALJ's finding as to Step Four of the Analysis is remanded for a new hearing consistent with this opinion.

## VIII.  Conclusion

For the foregoing reasons, the ALJ's decision to deny benefits to Plaintiff is remanded for a new hearing consistent with this opinion. Plaintiff's Motion for Summary Judgment is granted in part, and the Commissioner's motion is denied.

**ENTER:**

**P. Michael Mahoney, Magistrate Judge**
**United States District Court**

**DATE:**   8/14/2012